**AFFIRMED and Opinion Filed November 10, 2022**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-21-00392-CR

**COURTNEY DUANE BARLOW, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 380th Judicial District Court**
**Collin County, Texas**
**Trial Court Cause No. 380-82257-2020**

## MEMORANDUM OPINION

Before Justices Nowell and Smith[1]
Opinion by Justice Smith

Appellant Courtney Duane Barlow appeals from his conviction of possessing

one to four grams of tetrahydrocannabinol (THC), a Penalty Group 2 controlled

substance. *See* TEX. HEALTH & SAFETY CODE ANN. § 481.116(c). In six issues,

appellant contends (1) a discovery violation by the State prevented him from

confronting undisclosed witnesses, raising a scientific reliability objection, and

presenting a complete defense; (2) his conviction rests on false evidence; and (3) the

---

[1] Justice Leslie Osborne was a member of the original panel but has since resigned. Because they agree on the judgment, the two remaining justices decided the case. *See* TEX. R. APP. P. 41.1(b).

evidence is insufficient to support the trial court's conclusion that appellant possessed delta-9 THC at the time of his arrest. We affirm the trial court's judgment.

## Background

Appellant was charged with possessing two vape cartridges containing THC. He entered a plea of not guilty and waived his right to a jury.

The trial court held a virtual bench trial on Zoom. McKinney Police Officers Daniel Rogers and Travis Ray testified that they encountered appellant when responding to a criminal trespass call from an L.A. Fitness in August 2019. Ray conducted a consent search of appellant's personal property and discovered a small box containing two THC vape cartridges in a fanny pack. The box's labeling indicated that its contents were created with medical cannabis. Rogers took the evidence to the police station, inventoried it, and completed a drug lab submission form. The McKinney Police Department sent the evidence to Armstrong Forensic Laboratory (Armstrong) for analysis.

Dr. Kelly Wouters, Armstrong's director and a licensed forensic analyst, testified that Armstrong received a manila envelope containing a small cardboard box and two vape cartridges containing fluid. Armstrong was asked to test the fluid for the identification and concentration of controlled substances, including delta-9 THC, which is one of the isomers of THC. Citing Texas House Bill 1325,[2] Wouters

---

[2] Act of May 22, 2019, 86th Leg., R.S., ch. 764, §§ 2, 8, 2019 Tex. Gen. Laws 2084, 2085, 2099-100 (codified at TEX. AGRIC. CODE ANN. § 121.001, HEALTH & SAFETY §§ 481.002(5), (26)(F)).

explained that a delta-9 THC concentration threshold of 0.3 distinguishes whether a substance is hemp, which is legal, or not. The 0.3 percent threshold is used in many jurisdictions for items like the vape cartridges in this case.

According to Wouters, Armstrong is accredited to perform identification and quantification analyses of controlled substances by gas chromatography (GC), liquid chromatography (HPLC), or mass spectrometry (MS). HPLC, a well-established technique used and published in peer-reviewed scientific literature, was used to quantify the THC in this case. Wouters testified that the fluid in each vape cartridge (tested separately under lab numbers 001B and 001C) tested positive for delta-9 THC; 001B had a 22.2 percent plus or minus 2.6 percent total delta-9 THC concentration; and 001C had a 40.6 percent plus or minus 4.7 percent total delta-9 THC concentration. After testing, the combined reserve weight of 001B and 001C was 1.29 grams.

The State introduced into evidence a lab report prepared by Wouters and a case file, which contained bench notes, raw analytical data for the analyses performed, calibrations on quality control measures, and backstops to ensure the testing was performed correctly and within scientific standards. Wouters explained that Armstrong typically reports only the total delta-9 THC concentration. In cases like this one, performed under a Collin County grant, Armstrong also is required to report additional analytes, including delta-9 Tetrahydrocannabinolic acid (THCA). THCA, the acid form of THC, "decarboxylates and turns into THC under high

temperature over a longer period of time." The total THCA molecule does not become an equivalent concentration of THC; it is a corrected factor of 88 percent. The total delta-9 THC concentration is a combination of the concentrations of delta-9 THC and the decarboxylated portion of delta-9 THCA.

Defense counsel questioned Wouters on cross-examination about, among other things, the chain of custody for the evidence at Armstrong. Wouters testified that the case file did not include chain of custody detail, but the names of the four or five people at the lab who could have touched the evidence and information regarding who received, analyzed, and released the samples could be made available. On re-direct, Wouters identified those people as Elijah Hampton, Karen Deiss, Joe Delgado, and Jacklyn Merson – lab technicians who "could have had a step in the process of this analysis," "whose raw data [Wouters] analyzed," and whose initials are throughout the case file. The State had provided their names to defense counsel and advised that they were on standby to testify at trial if needed. Defense counsel did not question Wouters further about the work performed by the lab technicians or call any of them to testify.

The trial court found appellant guilty of THC possession as charged in the indictment. Following a punishment hearing, the trial court sentenced appellant to six years' confinement.

Appellant filed a motion for new trial, asserting (1) the verdict was contrary to the law and evidence and (2) the State did not produce material evidence

–4–

discoverable under Texas Code of Criminal Procedure Article 39.14. Appellant also filed posttrial article 39.14 requests, seeking nineteen different categories of information from Armstrong, and the State produced 206 pages of responsive documents, 39 pages of which were the previously-produced case file.

At a subsequent hearing, defense counsel advised that appellant's motion for new trial pertained to article 39.14 and discrepancies between the pretrial and posttrial productions. Defense counsel argued that reviewing the posttrial production made apparent that more individuals were involved in Armstrong's testing and analysis than disclosed before trial and in the testimony at trial. Appellant was thus deprived of information needed to lodge a Sixth Amendment objection to the pretrial production and to Wouters's testimony as a surrogate for those individuals and their work. Appellant also discovered "serious concerns about the testing, validity and reliability through [the lab's] methodology."

Defense counsel called Wouters to testify at the new-trial hearing and specifically asked about the role he and other Armstrong employees performed in this case. Counsel pointed to examples in which Wouters responded to questions at trial using "we" to describe procedures related to the analysis:

> [State:] What method of analysis was used in this particular case to determine any–if any delta-9 THC existed and if it existed at greater than .3 percent?

> [Wouters:] . . . there are three techniques that are used to confirm the identification, and on the identification side we use GC/MS in this case. We also use infrared spectroscopy . . . .

[State:]    . . . what backstop measures do you have in your lab?

[Wouters:]   All of the analyses we do are backed up by quality control procedures to verify their performance and validity and verification of the methods used. In these cases for the quantitation, we run series of blanks, we run positive controls that are carried through the same extraction process, we run calibration verification standards at the beginning and at the end of each run to make sure the system response is stable and reliable, we evaluate the calibration of the instrument in terms of it linearity and range to make sure that it is -- the response is reproducible and accurate over the measurement concentrations that are important for this analysis, and we run in every batch replicate samples of at least one sample in every batch to make sure that the analysis is reproducible and reliable.

Defense counsel also identified several questions posed to Wouters using the term "you" to which his responses did not clarify that he was not the individual who performed a particular procedure:

[State:]    So when you started testing it, it was .80 grams, give or take .02, and when you were finished testing it, it was .71 grams, give or take.

[Wouters:]   That's correct.

***

[State:]    So, is an amount of the liquid that you're analyzing used up in your testing?

[Wouters:]   Yes, it is.

***

[State:]    So, after you've tested, what were you left with in cartridge 1B?  Looks like you were left with .71 grams, and then plus the reserve weight in 1C is .58 and those added together are what?

[Wouters:]   1.29 grams.

***

[Defense counsel:] You said you received, or you in part did this testing in a certain way because Collin County put out a requested proposal and as part of that, you had to test these things a certain way; is that correct?

[Wouters:] That's correct.

Wouters testified that his use of "we" referred to Armstrong. He disagreed that his trial testimony imputed the work of somebody else to himself or that he gave a false impression.

Wouters described the role of each of the lab technicians,[3] who were licensed and essential to lab functions. Wouters's role was to perform the analysis and interpret the data. He did not personally weigh the samples, prepare solutions to use in the instruments, operate the instruments, or generate data:

> We have technicians that perform basic analytical functions and then we have the analyst who takes the data and actually draws conclusions and that's my role here as the analyst, so yes, I analyze the data which I think is part of the testing process, but I did not weigh the evidence physically myself.

Wouters further testified that he previously produced his complete case file, which contained the initials and handwriting of the individuals involved in the process, in good faith. It contained everything they used for forming their

---

[3] Elijah Hampton described the samples, recorded the weights, and separated the aliquots for analysis. Karen Deiss interpreted the infrared data; Wouters also interpreted it. Joe Delgado operated the CG/MS, running the samples through the instrument and generating data. Jacquelyn Merson operated the HPLC instrument. Andrew Armstrong, Armstrong's owner, also reviewed quantitative data and made some calculations on the work order for final processing of the lab report.

conclusions and opinions and what he thought was enough information for another chemist to review the data and see what was done.

Dr. Kevin Schug, a professor of analytical chemistry at the University of Texas at Arlington, testified on behalf of appellant. Schug had never worked in a forensic lab, but had worked in a quality assurance lab that implements methodology like a forensics lab. He found the documentation in the case file on the validation of methods to be "particularly lacking" and believed, based on the calibration curves for the HPLC quantitative analysis, that the calibration was improperly carried out and the results were generally unreliable.

Appellant's trial counsel also testified at the hearing. Either the day before or the day of trial, the State informed him of Armstrong employees on standby if he needed them to testify. He also acknowledged that the case file contained the employees' initials, and the fact that the State provided him with those employees' names and made them available on standby indicated they were part of the lab processes in this case. He recalled agreeing to Wouters testifying first and then calling the other Armstrong employees if issues arose or clarification was needed, but said, without providing further explanation, that the description of the agreement was "incomplete." Counsel also testified that, prior to trial, he was "well aware of [Armstrong] and had opinions as to its methodology."

The motion for new trial was denied by operation of the law. *See* TEX. R. APP. P. 21.8.

## Texas Code of Criminal Procedure Article 39.14

In his first four issues, appellant contends the State violated article 39.14 by withholding evidence from Armstrong having a logical connection to a consequential fact. Article 39.14(a) requires the State, upon timely request, to produce and permit the inspection and electronic duplication of "material" evidence by the defense.[4] CODE CRIM. PROC. art. 39.14(a). "Material" is defined as "having a logical connection to a consequential fact" and "synonymous with 'relevant.'" *Watkins v. State*, 619 S.W.3d 265, 290 (Tex. Crim. App. 2021).

Appellant raised his article 39.14 complaints in a motion for new trial, which the trial court denied by operation of law. We review a trial court's denial of a motion for new trial for an abuse of discretion. *State v. Herndon*, 215 S.W.3d 901, 906–07 (Tex. Crim. App. 2007). The trial court, as factfinder at a new-trial hearing, is the sole judge of witness credibility. *Okonkwo v. State,* 398 S.W.3d 689, 694 (Tex. Crim. App. 2013). We view the evidence in the light most favorable to the trial court's ruling, defer to the court's credibility findings, and assume the court made reasonable fact findings in support of the ruling. *State v. Simpson*, 488 S.W.3d

---

[4] More specifically, article 39.14 provides that "as soon as practicable after receiving a timely request from the defendant the state shall produce and permit the inspection and the electronic duplication, copying, and photographing, by or on behalf of the defendant, of any offense reports, any designated documents, papers, written or recorded statements of the defendant or a witness, including witness statements of law enforcement officers but not including the work product of counsel for the state in the case and their investigators and their notes or report, or any designated books, accounts, letters, photographs, or objects or other tangible things not otherwise privileged that constitute or contain evidence material to any matter involved in the action and that are in the possession, custody, or control of the state or any person under contract with the state." CODE CRIM. PROC. art. 39.14.

318, 322 (Tex. Crim. App. 2016). We reverse the denial of a motion for new trial only if the trial court acted without reference to any guiding rules or principles; that is, the ruling was "so clearly wrong as to lie outside that zone within which reasonable persons might disagree." *Id.* "[T]rial courts do not have the discretion to grant a new trial unless the defendant demonstrates that his first trial was seriously flawed and the flaws adversely affected his substantial rights to a fair trial." *Herndon*, 215 S.W.3d at 909 (citing TEX. R. APP. P. 44.2); *Watkins v. State*, No. 10-16-00377-CR, 2022 WL 118371, at *1–2 (Tex. App.—Waco Jan. 12, 2022, pet. ref'd) (mem. op., not designated for publication) (applying rule 44.2(b) harm analysis for non-constitutional error to article 39.14 violation).

In his first issue, appellant contends the Armstrong technicians performed analytical functions related to the samples and, therefore, also should have been sponsoring witnesses for the scientific evidence at trial. Because the technicians and their roles were not disclosed, he was deprived of his right to confront them and prevented from objecting to Wouters's testimony as a surrogate. In his second and third issues, appellant asserts that the State's failure to disclose also, respectively, deprived him of knowledge sufficient to object to the admissibility of the State's scientific evidence and prevented him from calling the technicians as witnesses in his case-in-chief.

To be sure, Wouters's testimony at the new-trial hearing, unlike at trial, provided specific information on the role that each technician performed with

–10–

respect to the analysis of the samples in this case. But, before trial, the State provided appellant with the case file, which included the technician's initials on QC reports, worksheets, lab reporting forms, and other documents. At least by the day of trial, the State provided the full names of four technicians on standby to testify at trial. There appears to have been some sort of agreement between the State and appellant that Wouters would testify first and the others would be called if needed. During trial, Wouters identified the technicians as individuals who had a step in the process and whose raw data he analyzed in this case. He testified that additional information about who received, analyzed, and released the samples could be made available. And appellant's brief in support of new trial acknowledged that, "[d]uring trial, and through the testimony of Dr. Wouters . . ., it became apparent to trial counsel that certain material evidence was not produced in advance of trial despite his pre-trial discovery request."

Despite all this, defense counsel rested appellant's case without asking Wouters to clarify what the technicians did, calling any of them to testify, requesting a continuance to pursue additional information about who, specifically, received, analyzed, and released the samples, or raising a possible article 39.14 violation. We also note that, when appellant had another opportunity to call the technicians to testify at the new-trial hearing, he did not.

The trial court, having presided over both the trial and the new-trial hearing, reasonably could have concluded that appellant had sufficient information at trial to

–11–

raise an article 39.14 objection and seek a continuance. *See Rodriguez v. State*, 630 S.W.3d 522, 524–25 (Tex. App.—Waco 2021, no pet.) (defendant waived article 39.14(a) complaint by not requesting continuance when State disclosed document on first day of trial); *Siebert v. State*, No. 05-18-01386-CR, 2020 WL 5542544, at *6 (Tex. App.—Dallas Sept. 16, 2020, pet. ref'd) (mem. op., not designated for publication) (defendant was required to seek continuance after late-tendered evidence by State). The trial court further could have reasonably found that, having not objected or sought a continuance, appellant made a tactical decision to proceed to verdict and, therefore, forfeited the opportunity to raise the issue in a motion for new trial. *See Colone v. State*, 573 S.W.3d 249, 260 (Tex. Crim. App. 2019) ("A defendant may not raise a matter for the first time in a motion for new trial if he had the opportunity to raise it at trial."); *Yazdchi v. State*, 428 S.W.3d 831, 844–45 (Tex. Crim. App. 2014).

The trial court also reasonably could have concluded, based on the evidence adduced at the new-trial hearing, that appellant did not demonstrate the State's failure to fully disclose the role of each Armstrong technician prior to trial affected his substantial rights to a fair trial.

Appellant asserts that his inability to confront the technicians at trial harmed him because they "were in a position to 'do something fraudulent that would send someone to jail erroneously' or simply commit an error 'that would affect the outcome of a criminal case.'" Appellant developed evidence in support of his

–12–

argument through Schug's testimony at the new-trial hearing. Schug was generally critical of the validation of Armstrong's methods[5] and specifically critical of a calibration curve, against which controlled substances are judged, for the HPLC quantitative analysis. Schug believed the calibration, which was performed by Joe Delgado, was incorrect and any measurement made using the established curve significantly overestimated the amount of chemical present in the mixture.[6]

The evidence also established that, although Wouters developed the testing protocols, he did not directly observe the technicians' work in this case. He acknowledged that, "if somebody was determined to do something illegal, immoral, or irresponsible, there are ways they could probably do that." But Wouters also described Armstrong's quality control measures, which included running series of blanks, running positive controls that are carried through the same extraction process, running calibration verification standards at the beginning and end of each run to check the stability and reliability of the system response, evaluating instrument calibration to ensure the response is reproducible and accurate, and running replicate samples in each batch to ensure the analysis is reproducible and reliable. Different analysts, or technicians in some cases, perform different types of testing, like GC/MS versus HPLC, so more than one person is generating data to

---

[5] On cross-examination, Schug testified that he had not received or reviewed eight peer-reviewed articles on Armstrong's methodology that the State provided to defense counsel.

[6] Appellant now asserts that he "would have been more than happy to let Joe Delgado go toe-to-toe with" Schug at trial, but he did not call Delgado to testify at the new-trial hearing.

verify the presence of delta-9 THC. According to Wouters, the case file's quality control data validates and verifies that the instruments are working properly and are reliable and defensible.

"The purpose of the hearing [on a motion for new trial] is to give the defendant an opportunity to fully develop the matters raised in his motion." *Wallace v. State*, 106 S.W.3d 103, 108 (Tex. Crim. App. 2003). Here, appellant argued that the State failed to disclose in discovery and at trial the specific role each technician performed and the harm he allegedly suffered as a result. The trial court, however, was the sole judge of witness credibility. Having heard the evidence presented, the court reasonably could have found that appellant did not demonstrate that the trial was seriously flawed or that the flaw alleged adversely affected his substantial rights to a fair trial. *See* TEX. R. APP. P. 44.2(b); *Herndon*, 215 S.W.3d at 909.

In his fourth issue, appellant asserts the State's pretrial production deprived him of "sufficient evidence from which an expert could have derived anything meaningful." He claims that the case file "worked only enough to raise the suspicion of a professor in analytical chemistry, and only by virtue of what was missing," but the professor found "significant flaws" in Armstrong's methodology after reviewing the posttrial production.

Although appellant asserts Schug found flaws in Armstrong's methodology once he read the posttrial production, the record shows otherwise. At the new-trial hearing, appellant's counsel questioned Schug primarily about the case file produced

–14–

to appellant before trial. Schug found the case file documentation on the "validation of the methods used" to be "particularly lacking." Counsel also asked Schug specifically about the calibration, or drug curve, shown on a "Short Quant. Report (ESTD)" contained in the case file. Schug testified that he was used to reviewing reports like the case file and knew what to look for, like the calibration model. From his review, it did "not look like they were reliably performed." Schug testified that these matters probably would not be evident to a non-scientist looking at the case file; he imagined that is why an attorney would have an expert look at it. Schug further testified that the posttrial production "did not fill those gaps, did not add appreciably more information that would make [him] believe that this was validated appropriately."

Based on Schug's testimony, the trial court was free to believe that appellant possessed sufficient information at trial to defend his case. Consequently, the trial court reasonably could have concluded that the State's failure to turn over the full posttrial production before trial did not affect appellant's substantial rights to a fair trial. *See* TEX. R. APP. P. 44.2(b); *Herndon*, 215 S.W.3d at 909.

In sum, we conclude that the trial court's denial of appellant's motion for new trial was not so clearly wrong as to lie outside that zone within which reasonable persons might disagree and, therefore, the trial court did not abuse its discretion. Accordingly, we overrule appellant's first four issues.

**False Evidence**

In his fifth issue, appellant contends his conviction rests on false evidence in violation of his due process rights. Appellant complains Wouters's trial testimony falsely indicated that Wouters undertook testing and quality control measures that Armstrong technicians actually performed. The State argues that appellant failed to preserve his due process claim because he did not raise it at the hearing on his motion for new trial.

The use of material false testimony to procure a conviction violates a defendant's due process rights under the Fifth and Fourteenth Amendments to the United States Constitution. *Ex parte De La Cruz,* 466 S.W.3d 855, 866 (Tex. Crim. App. 2015). However, false evidence claims are subject to the traditional rules of error preservation. *See Estrada v. State*, 313 S.W.3d 274, 288 (Tex. Crim. App. 2010); *Valdez v. State*, No. AP-77,042, 2018 WL 3046403, at *5 (Tex. Crim. App. June 20, 2018) (not designated for publication).

To preserve error for appellate review, an appellant ordinarily must make a timely request, objection, or motion to the trial court stating the grounds for the ruling sought "with sufficient specificity to alert the trial court to the complaint." *See* TEX. R. APP. P. 33.1(a). "A complaint is timely if it is made 'as soon as the ground of objection becomes apparent.' Regarding its specificity, the objection must simply be clear enough to provide the judge and the opposing party an opportunity to address and, if necessary, correct the purported error." *Pena v. State*, 353 S.W.3d

797, 807–09 (Tex. Crim. App. 2011) (internal citations omitted)). Failure to object in a timely and specific manner forfeits appellate complaints on the admissibility of evidence, even if its admission violates a constitutional right. *Valdez*, 2018 WL 3046403, at *5–6 (distinguishing *Estrada*, 313 S.W.3d at 286–88, in which the defendant had "no duty" to object at trial when he "could not reasonably be expected to have known that [the witness's] testimony was false at the time that it was made.").

In his brief in support of new trial, appellant alleged that Wouters's testimony "in the first-person or first-person plural viewpoint ('I' or 'we')" "left the impression that he personally tested or analyzed the evidence in this case or was personally involved in the testing or analysis." At the new-trial hearing, defense counsel questioned Wouters extensively about his trial testimony and now relies on that testimony to support his false evidence complaint. Appellant, however, did not lodge an explicit false evidence objection at the new-trial hearing sufficient to alert the State and the trial court of the need to address it. Instead, he pursued his article 39.14 objection and an objection to the validity and reliability of the lab's testing and methodology. Accordingly, we conclude that he has not preserved the complaint for appellate review. *See* TEX. R. APP. P. 33.1(a)(1); *Medina v. State*, No. 10-19-00007-CR, 2020 WL 4690150, at *1–2 (Tex. App.—Waco Aug. 12, 2020, no pet.) (mem. op., not designated for publication) (defendant's false evidence complaint on

–17–

appeal was not preserved when it did not comport with article 39.14 complaint in motion for new trial).

Even assuming appellant's complaint about Wouters's testimony was sufficient to raise a false evidence objection at the new-trial hearing, we cannot conclude that the trial court abused its discretion in denying appellant's motion on that basis. There was substantial evidence regarding Wouters's trial testimony at the new-trial hearing. The trial court had the benefit of presiding over both the trial and the new-trial hearing and was in the best position to evaluate whether Wouters's trial testimony actually left a false impression regarding who performed the testing and analysis and, if so, whether that false impression adversely affected appellant's substantial rights to a fair trial. Deferring to the court's credibility findings and viewing the evidence in the light most favorable to the trial court's ruling,[7] we cannot conclude that the trial court's denial of the motion for new trial with respect to appellant's false evidence complaint was so clearly wrong as to lie outside that zone within which reasonable persons might disagree.

For these reasons, we overrule appellant's fifth issue.

### Sufficiency of the Evidence

In his sixth issue, appellant contends the evidence is insufficient to support the trial court's conclusion that appellant possessed delta-9 THC at a concentration

---

[7] Among other evidence at the new-trial hearing, the trial court heard Wouters's testimony that he used "we" to refer to Armstrong, considered himself to be part of the processes, and did not believe he gave a false impression that he personally performed the technicians' work.

of greater than 0.3 percent at the time of his arrest. Directing the Court to Wouters's testimony that THCA decarboxylates and turns into THC under high temperatures or even exposure to room temperature over a longer period of time, appellant asserts it is unknown how much delta-9 THC appellant possessed.

When reviewing the legal sufficiency of the evidence, we consider all the evidence in the light most favorable to the verdict and determine whether any rational factfinder could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Circumstantial evidence and direct evidence are "equally probative." *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021). We defer to "the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. (quoting *Jackson*, 443 U.S. at 319). The factfinder may draw reasonable inferences from the evidence "as long as each inference is supported by the evidence presented at trial." *Id*. at 150 (quoting *Hooper v. State*, 214 S.W.3d 9, 15 (Tex. Crim. App. 2007)).

Appellant was charged with possessing THC, other than marijuana, a controlled substance in Penalty Group 2, in an amount of one gram or more but less than four grams, including adulterants and dilutants. *See* HEALTH & SAFETY §§ 481.103(a)(1), 481.116(c). The definition of "controlled substance" expressly excludes "hemp, as defined by Section 121.001, Agriculture Code, or the tetrahydrocannabinols in hemp." *Id*. § 481.002(5). Section 121.001 of the

Agriculture Code defines "hemp" as "the plant Cannabis sativa L. and any part of that plant, including the seeds of the plant and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a delta-9 tetrahydrocannabinol concentration of not more than 0.3 percent on a dry weight basis." TEX. AGRIC. CODE ANN. § 121.001; *see also* HEALTH & SAFETY § 443.202 (applying 0.3 percent rule to cannabinoid and cannabidiol oils). Therefore, to prove that the fluid appellant possessed was a controlled substance, the State had to demonstrate the fluid had a delta-9 THC concentration level above 0.3 percent.

Wouters testified that the fluid in each vape cartridge tested positive for delta-9 THC. Specifically, the liquid in 001B had approximate concentrations of 22.1 percent delta-9 THC, 0.065 percent delta-9 THCA, and 22.2 percent total delta-9 THC, and the liquid in 001C had approximate concentrations of 40.5 percent delta-9 THC, 0.120 percent delta-9 THCA, and 40.6 percent total delta-9 THC. Although the lab tested separately for delta-9 THCA pursuant to the terms of a Collin County grant, Wouters explained that the total delta-9 THC is a combination of the delta-9 THC and the decarboxylated portion of delta-9 THCA. Wouters further explained that THCA becomes THC if it is heated or ingested, so it is considered THC for legal purposes. Accordingly, whether THCA converts to THC prior to an analysis is immaterial; the total delta-9 THC is the relevant concentration.

Appellant's implication that the delta-9 THC concentration in the vape cartridge fluids increased due to any conversion of THCA into THC after he

–20–

possessed them is unsupported by the record. Instead, delta-9 THCA is part of the total delta-9 THC calculation. *Cf.* AGRIC. § 121.001 (definition of "hemp" includes "acids" among parts of plant that should be included in calculating concentration of delta-9 THC). Moreover, the concentration of both delta-9 THC and total delta-9 THC in each sample was significantly higher than 0.3 percent.

We must defer to the trial court's evaluation of the credibility and weight of the evidence. *Carter*, 620 S.W.3d at 149. Here, viewing the evidence in the light most favorable to the verdict, the trial court could have reasonably concluded based on Wouters's testimony that appellant possessed 1.29 grams of THC with a total delta-9 THC concentration of more than 0.3 percent. Accordingly, we conclude the evidence was sufficient for the trial court to find appellant guilty of the charged offense and overrule appellant's sixth issue.

We affirm the trial court's judgment.


/Craig Smith/
CRAIG SMITH
JUSTICE


210392f.u05
Do Not Publish
TEX. R. APP. P. 47.2(b)



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

COURTNEY DUANE BARLOW,
Appellant

No. 05-21-00392-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 380th Judicial District
Court, Collin County, Texas
Trial Court Cause No. 380-82257-2020.
Opinion delivered by Justice Smith. Justice
Nowell participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered this 10th day of November, 2022.